UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION

LOANDRIA DAHMER,                                              Plaintiff,

v.                                          Civil Action No. 1:18-cv-124-DJH-LLK

WESTERN KENTUCKY UNIVERSITY
et al.,                                                     Defendants.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Plaintiff Loandria Dahmer alleges that her alma mater, Defendant Western Kentucky University, violated Title IX and 42 U.S.C. § 1983 in its handling of harassment she experienced on campus.  (*See* D.N. 38)  Dahmer also asserts negligence and § 1983 claims against WKU employees Andrea Anderson and Charley Pride, as well as university president Timothy Caboni. (*See id.*)  Following significant discovery, Defendants moved for summary judgment on Dahmer's federal claims and dismissal of her state-law claims.  (D.N. 66)  Dahmer then moved for partial summary judgment on her federal claims.  (D.N. 105-1)  Also pending before the Court are motions by Defendants and Dahmer to exclude expert testimony.  (D.N. 71; D.N. 75)  For the reasons set forth below, Defendants' motion for summary judgment will be granted, Dahmer's motion for partial summary judgment will be denied, and the motions to exclude will be denied as moot. Dahmer's remaining state-law claims will be remanded to state court.

## I.

Dahmer entered WKU as a freshman in the fall of 2015.  (D.N. 105-2, PageID # 6963) Dahmer participated in many campus activities, including Student Government Association (SGA).  (*Id.*, PageID # 6971–74)  Dahmer was elected to serve as an SGA senator her freshman year and chaired an SGA committee during her sophomore year.  (*Id.*, PageID # 7021, 7025)  The

1

following school year, 2017–2018, Dahmer served as SGA president. (*Id.*, PageID # 6938) Dahmer appointed six women and one man to her executive board. (*Id.*, PageID # 7042–43) Charley Pride, WKU's Director of Student Activities, Organizations, and Leaderships, was SGA's faculty advisor during Dahmer's term. (D.N. 101-3, PageID # 5828, 5831) Pride was also a member of Phi Delta Theta fraternity and remained actively involved with it even as an administrator. (*Id.*, PageID # 5828–29) Several members of SGA were also Phi Delta Theta members. (D.N. 105-2, PageID # 7040)

Dahmer began experiencing trouble within the SGA shortly into her tenure as president, during the fall semester of 2017. (D.N. 105-2, PageID # 7040–41) According to Dahmer, "it started out . . . smaller," with male SGA members not calling women leaders by their titles. (*Id.*, PageID # 7041) Then the behavior escalated into interrupting "women specifically" and "talking over all of the women executive council members who would speak." (*Id.*) Dahmer felt that SGA members were displaying "discriminatory behavior regarding like the treatment of women leaders versus prior years when there had been male presidents." (*Id.*, PageID # 7042)

In late September, Dahmer and a member of her executive board spoke with Melanie Evans, WKU's coordinator of sexual-assault services and student conduct. (*Id.*, PageID # 7043). Dahmer asked Evans to speak to SGA about Title IX and appropriate conduct. (*Id.*, PageID # 7044) Although Evans asked Dahmer and the executive board member in that meeting if they had "experienced something" and would like to make a formal complaint, Dahmer "didn't elaborate with Ms. Evans" and declined to disclose or make a complaint. (*Id.*) The following month, Evans gave a presentation on Title IX during an SGA meeting. (*Id.*, PageID # 7044–45)

Andrea Anderson, assistant general counsel and Title IX coordinator at WKU, also reached out to Dahmer in late October. (*Id.*, PageID # 7060–61) Anderson sent Dahmer an email asking

to meet, writing that it had "come to [her] attention, through a couple of different sources, that [Dahmer] may have personally experienced some inappropriate behavior of a sex or gender-based nature." (*Id.*, PageID # 7229)  Anderson testified that the source she was referring to was Melanie Evans, who informed Anderson about her meeting with Dahmer.[1] (D.N. 105-10, PageID # 8001) When a week passed with no response from Dahmer, Anderson forwarded her original email to a different email address of Dahmer's, asking Dahmer to "[p]lease give [her] a call at [Dahmer's] earliest convenience to discuss [Anderson's] message below." (D.N. 105-2, PageID # 7229) Dahmer called back once when the office was closed, did not leave a voicemail, and did not attempt to call Anderson again. (*Id.*, PageID # 7064–66)

Further incidents occurred in October 2017.  In early October an SGA member and Phi Delta Theta member (Student 1) allegedly plagiarized a bill written by Dahmer. (*Id.*, PageID # 7066) After Dahmer mentioned the similarity of the two bills in front of the SGA, Student 1 stormed into the SGA executive meeting, called Dahmer a liar, and screamed at her. (*Id.*) Dahmer testified that she "believe[s] it was during this meeting" that Student 1 called her "the 'B' word." (*Id.*, PageID # 7067)  Later that month, during a heated SGA debate, male SGA members made "[g]ender-based comments" towards Dahmer, although Dahmer did not testify regarding the specifics of these comments: "I think afterwards there was some talk about our cabinet, because it was all female.  And because like we were all very assertive in our beliefs, there might have been some discussion of us being like the 'B' word, but that was not necessarily told to us at this meeting." (*Id.*, PageID # 7053)

---

[1] Anderson also testified about another source, a colleague who informed her of a potential incident of inappropriate contact that happened to Dahmer at a Board of Regents event. (D.N. 105-10, PageID # 8002) Dahmer testified that this incident is not part of her lawsuit. (D.N. 105-2, PageID # 7070)

Meanwhile, Dahmer also had issues with Pride.  Dahmer testified that Pride would invite her into his office "sometimes to say things that were lewd or inappropriate, things that, by any means, would be determined sexual harassment."  (*Id.*, PageID # 7011)  Dahmer believed that Pride "was quite protective of the fellow members of his fraternity," and he would speak to Dahmer about "his perception of . . . [Dahmer's] treatment towards the Phi Delts."  (*Id.*, PageID # 7056)  Pride, a mandatory title IX reporter (*see* D.N. 101-3, PageID # 5827), did not report the conduct of the male SGA members.  (*Id.*, PageID # 5838)

In January 2018, a group of SGA members sought to impeach Dahmer and one of her female executive board members.  (D.N. 105-2, PageID # 7074–75)  During a conversation regarding impeachment, Student 1 stated that "this situation in SGA is shitty," which Dahmer took to mean "he was saying that both myself and the situation in SGA in general were shitty."  (*Id.*, PageID # 7075–76)  In February 2018, Dahmer received a photo of a string of messages written by SGA students in a private chat on the "GroupMe" application.  (*Id.*, PageID # 7078; *see id.*, PageID # 7230)  One SGA member had written "[t]his is so passive aggressive" (*id.*, PageID # 7230), to which another SGA member, Student 2, replied, "I could punch that b**** and her lawyer in the face."  (*Id.*)  Student 1 responded, "I hope she gets cancer and catches on fire," to which Student 2 wrote "Sorry."  (*Id.*)  Another SGA member then wrote, "[c]ould she be any more of a c*** like god damn."  (*Id.*)  Two days later, on Friday, February 9, 2018, Dahmer received a note on her car that said "go f*** yourself."  (*Id.*, PageID # 7083; *see id.*, PageID # 7232)  Dahmer, assuming that a member of SGA had put the note on her car, called the campus police to report the incident.  (*Id.*, PageID # 7083–85)

After speaking with campus police, Dahmer told her residence-hall director about the behavior of the male SGA members, Pride's comments, the GroupMe message, and the note on

her car.  (*Id.*, PageID # 7086–87)  Feeling unsafe, Dahmer left her dorm and began staying off campus.  (*Id.*, PageID # 7087–88)  Dahmer's residence-hall director reported Dahmer's experiences to WKU's Title IX office.  (*Id.*, PageID # 7090)  The following Monday, Dahmer met with Joshua Hayes, director of WKU's Equal Employment Opportunity office, specifically regarding her issues with Charley Pride.  (*Id.*, PageID # 7091–93)  That same day, the Student Conduct office scheduled an appointment with Dahmer for the next day.  (*Id.*, PageID # 7091) Director of Student Conduct Michael Crowe, Melanie Evans, and Andrea Anderson were present at that meeting, during which they informed Dahmer that she could utilize WKU's police-escort system.  (*Id.* PageID # 7095–96, 7104)  WKU immediately issued two no-contact orders, prohibiting Student 1 and Student 2 from communicating with Dahmer.  (*Id.*, PageID # 7099)

WKU's Title IX office then investigated Dahmer's complaint, informing Dahmer of the result on March 8, 2018.  (*Id.*, PageID # 7101)  WKU ultimately found that no Title IX violation had occurred because the conduct Dahmer complained of was not sex or gender-based.  (D.N. 105-9, PageID # 7806)  WKU also concluded that although no Title IX violation had occurred, Student 1 and Student 2's conduct had been unruly and violated WKU's student-conduct code.  (*See id.*, PageID # 7821, 7832)  As a result, Student 1 was forced to resign from SGA, and the no-contact orders remained in place.  (*See* D.N. 105-2, PageID # 7109; D.N. 105-9, PageID # 7904, 7906, 7921)  Pride also stepped down as faculty advisor of SGA in March 2018, after learning from his supervisor that "[Dahmer] had told someone that I was going to kill her."  (D.N. 101-3, PageID # 5835)

Dahmer did not exercise her right to appeal the outcome of the investigation.  (D.N. 105-10, PageID # 8052–53)  Dahmer testified that following the investigation, "there was still general animosity" in SGA, but "in some ways it did get better."  (D.N. 105-2, PageID # 7114)

## II.

Before the Court may grant a motion for summary judgment, it must find that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of specifying the basis for its motion and identifying the portions of the record that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party satisfies this burden, the nonmoving party must produce specific facts demonstrating a genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

The evidence of the nonmoving party is to be believed, *id*. at 255, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in that party's favor.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Nevertheless, the nonmoving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Id.* at 586.  Instead, the Federal Rules of Civil Procedure require the nonmovant to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252.

### A.    Title IX

"Title IX provides that '[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" *Williams ex rel. Hart v. Paint Valley*

*Local Sch. Dist.*, 400 F.3d 360, 366 (6th Cir. 2005) (quoting 20 U.S.C. § 1681(a)).  A student who experiences sexual harassment from faculty or fellow students may hold the school liable for damages under Title IX.  *See Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 290 (1998); *Davis v. Monroe Cty. Bd. of Educ.,* 526 U.S. 629, 643 (1999).  Dahmer's Title IX claims against WKU rest on three grounds: (1) her alleged experience of sexual harassment by other students in the SGA, (2) her alleged sexual harassment by Pride, and (3) WKU's alleged retaliation against her for filing her Title IX lawsuit.  (D.N. 38, PageID # 733–35)

  **1. Student-on-Student Harassment**

  In *Davis*, the Supreme Court held that student-on-student sexual harassment can sustain a Title IX claim against the victim's school "[i]n certain limited circumstances."  *Davis*, 526 U.S at 643.  To hold WKU liable for the harassment she allegedly suffered from her peers, Dahmer "must establish (1) sexual harassment so severe and offensive that it deprive[d] [her] of access to [WKU's] educational opportunities, (2) [WKU's] actual knowledge of the harassment, and (3) [WKU's] 'deliberate indifference' to the harassment."  *Gordon v. Traverse City Area Pub. Schs.*, 686 F. App'x 315, 323 (6th Cir. 2017) (quoting *Davis*, 526 U.S. at 650).  This "formula clearly has two separate components, comprising separate-but-related torts by separate-and-*un*related tortfeasors: (1) 'actionable harassment' by a student . . . and (2) a deliberate-indifference intentional tort by the school."  *Kollaritsch v. Mich. State Univ. Bd. of Trs.*, 944 F.3d 613, 619–20 (6th Cir. 2019) (internal citations omitted).  "By design and effect . . . [this] is a 'high standard.'"  *Id*. at 619 (quoting *Davis*, 526 U.S. at 643).

  Even if Dahmer experienced actionable harassment, she has not demonstrated that WKU was deliberately indifferent to it.  Arriving at this conclusion requires first determining when WKU had actual knowledge of the alleged harassment.  "Only when an 'appropriate person' at a school

knows about sexual discrimination does the school have 'actual knowledge.'" *Kesterson v. Kent State Univ.*, 967 F.3d 519, 527 (6th Cir. 2020) (citing *Gebser*, 524 U.S. at 290).  An appropriate person is someone who "at a minimum has authority to address the alleged discrimination . . . on the [school's] behalf." *Id*. (alteration in original).  Dahmer argues that WKU had actual knowledge of her sexual harassment in the fall of 2017, because at that time (1) "Charley Pride witnessed and directly participated in the harassing behavior," (2) Anderson and Evans "had been aware of the possibility of behavior occurring in the SGA that may have been behavior that fell under Title IX," and (3) Crowe "became aware things may have been abuzz or amiss."  (D.N. 105-1, PageID # 6904–05)

In *Kesterson*, the plaintiff informed her softball coach, two assistant coaches, her team's academic counselor, and the executive director of her university's Women's Center that her softball coach's son, a fellow student, had raped her.  967 F.3d at 524.  The Sixth Circuit held that none of these individuals qualified as an appropriate person, even though they were all mandatory reporters under the university's Title IX policy (and none had reported the plaintiff's allegation). *Id.* at 528.  The Court further explained:

> Yes, [these individuals] could have aided [the plaintiff] in getting access to helpful resources. And yes, they could have, and should have, reported her allegations to [the university]. But a university employee's ability to mitigate hardship or refer complaints does not make them an "appropriate person."  Otherwise, every employee would qualify and schools would face a form of vicarious liability that Title IX does not allow.

*Id.* (internal citations omitted).  The Sixth Circuit concluded that the "appropriate person" was the university's deputy Title IX coordinator because "she had the authority to take corrective actions on [the university's] behalf to remedy the sexual discrimination [the plaintiff] faced." *Id.*  Further examples of an appropriate person are a school's principal and assistant principal, and the county

8

disciplinary supervisor.  *See Stiles ex rel. D.S. v. Grainger Cty., Tenn.*, 819 F.3d 834, 848 (6th Cir. 2016).

Based on the authority cited above, Pride does not qualify as an "appropriate person." During the relevant time period, Pride was WKU's Director of Student Activities, Organizations, and Leaderships (D.N. 39, PageID # 746), as well as the faculty advisor for the SGA.  (D.N. 105-8, PageID # 7607)  Pride testified that his main job duties as Director of Student Activities were to "[m]anage the budget, manage the staff, [and] provide direction and supervision."  (*Id.*, PageID # 7596)  Pride acknowledged that as SGA advisor, he had a duty to intervene if students were experiencing harassment within the SGA.  (*Id.*, PageID # 7608–09) Dahmer argues that Pride "had the ability to take corrective action to end the discrimination . . . [because] he had a duty as the SGA advisor to supervise and intervene if harassing behavior was occurring."  (D.N. 105-1, PageID # 6907)

But *Kesterson* makes clear that Pride's "ability to mitigate hardship" in the SGA by supervising or intervening in student behavior is not enough to make him an appropriate person under Title IX, because no facts indicate that Pride had the ability to address the harassment "on the [school's] behalf."  967 F.3d at 528.  On the contrary, Pride testified that he had a limited ability to address sexual harassment and misconduct: "[T]here's certain things I cannot do to students.  They have to go through a process where there is the Title IX investigation, the ADRS, the office of student conduct.  Those are some of the actions—they would have to take the actions on those students."  (D.N. 101-3, PageID # 5826)  Anderson confirmed this, explaining that WKU does not "ask [its] employees to respond [to a complaint of sexual misconduct] other than to make a report.  So if [the employee is] aware of something that could be a potential Title IX issue, they are to make a report.  But [WKU does not] ask and would prefer they not investigate." (D.N. 105-

9

10, PageID # 7970–71) WKU's actual knowledge thus cannot rest on any knowledge Pride may have had of the situation in the fall of 2017.[2]

As for the other individuals Dahmer identifies, Anderson testified that in the fall of 2017 she "was aware there was a possibility" of "possible behavior going on in the SGA that may have been behavior that fell under Title IX." (*Id.*, PageID # 8007)  Anderson reached out to Dahmer twice, but did not receive a response. *See supra* part I.  Evans asked Dahmer directly if she had been subjected to harassment and wanted to make a complaint, and Dahmer declined to do so. *See id.*  Similarly, Crowe testified that in the fall of 2017, after Dahmer met with Evans, he "was able to feel that something was abuzz and something was amiss," meaning "that [SGA] had some things that they wanted us to be involved with." (D.N. 105-9, PageID # 7799)  Crowe specified that the concern that Dahmer had raised was "with the professionalism of how the SGA was functioning." (*Id.*, PageID # 7800–01)  Crowe further testified that after Evans gave her presentation to the SGA "it went radio silent" until February 2018, and that Crowe assumed "that everything was okay" since "no other reports or anything was brought to our attention." (*Id.*, PageID # 7802)

In sum, while Anderson, Evans, and Crowe knew of the possibility of problems within SGA in the fall of 2017, they did not have actual knowledge of the alleged harassment. *See Kesterson*, 967 F.3d at 527 (citing *Gebser*, 524 U.S. at 290) ("Only when an 'appropriate person'

---

[2] In her reply, Dahmer argues that Brian Kuster, Pride's supervisor, knew of the harassment within SGA and is an appropriate person under Title IX. (D.N. 96, PageID # 5517)  But even if Kuster qualifies as an appropriate person, the facts do not show that he had actual knowledge of the situation within SGA.  Pride testified that he met with Kuster every two weeks and that Kuster "would know exactly what was going on in student government." (D.N. 105-8, PageID # 7637)  Pride clarified, however, that he did not tell Kuster that he thought the situation was dangerous, but instead that it was "what we've been dealing with for the past five years with people not getting along." (*Id.*)  Moreover, Pride himself did not believe that the situation in SGA violated Title IX (*see* D.N. 101-3, PageID # 5834), and no evidence indicates that Kuster received any information about the situation other than what Pride told him.

at a school *knows* about sexual discrimination does the school have 'actual knowledge.'" (emphasis added)); *Kollaritsch*, 944 F.3d at 621 (describing *Davis* as "rejecting an imputed-knowledge standard under agency principles or a should-have-known standard based in negligence"). WKU thus did not have actual knowledge of the alleged harassment until February 2018, when Dahmer's residence-hall director reported Dahmer's complaint to the Title IX office. *See supra* at part I.

In order to establish deliberate indifference by WKU, Dahmer must show that after WKU gained actual knowledge of her harassment, there was "some further incident of actionable sexual harassment, that the further actionable harassment would not have happened but for the objective unreasonableness (deliberate indifference) of the school's response, and that the Title IX injury is attributable to the post-actual-knowledge further harassment." *Kollaritsch*, 944 F.3d at 623–24. "For student-on-student sexual harassment to be *actionable* . . . it must be (a) severe, ([b]) pervasive, and (c) objectively offensive." *Id.* at 620 (citing *Davis*, 526 U.S. at 651).

Dahmer points to several examples of harassment that occurred after her residence hall director reported her complaint in February 2018.[3] First, Dahmer argues that despite the issuance of the no-contact orders, she "still felt unsafe and intimidated as Student 1 and Student 2 were still allowed to attend SGA events and the [no-contact orders] provided no restrictions for SGA." (D.N.

---

[3] Dahmer also discusses conduct experienced by other female SGA members post-February 2018. (*See, e.g.*, D.N. 104-1, PageID # 6241 (noting that "[Dahmer] and other female SGA members still felt threatened and scared with [Student 1's] continued presence in SGA")) Additionally, Dahmer testified that other members of her cabinet "began to fear because since Student 1 couldn't speak directly to me, they were afraid that he might escalate his behavior towards them." (D.N. 105-2, PageID # 7103) But *Kollaritsch* makes clear that conduct not directed at Dahmer does not qualify as further actionable harassment. *See* 944 F.3d at 621–22 ("Because the further harassment must be inflicted against the same victim, the plaintiff 'cannot . . . premise the [further-harassment] element of her Title IX claim on conduct [by the perpetrator] directed at third parties.'" (quoting *Pahssen v. Merrill Community School Dist.*, 668 F.3d 356, 363 (6th Cir. 2012))).

104, PageID # 6240; *see also* D.N. 105-2, PageID # 7102–03)  Dahmer also claims that "Student

1 continued to engage and harass [her] and created what was apparently a parody Twitter account

where [Student 1] referenced [Dahmer] and stated, 'Talk shit, get hit? More like talk shit get sued

thx Madame Prez' amongst other things."  (D.N. 104-1, PageID # 6242)  Finally, Dahmer cites

her deposition where, when asked if she "experience[d] any kind of harassing or discriminatory

behavior" between the conclusion of the Title IX investigation and the end of her presidency, she

stated:

> I guess, there was still general animosity, especially because . . . two
> female members of the executive cabinet had decided to run for
> reelection in their positions.  And so, there was still like, I guess, a
> lot of gender stigma and some terms being used.  Debate was still
> very aggressive.  I was still being like cut off when I spoke in debate
> and, oftentimes, would be interrupted, but it was not to the same
> level as it had been prior to March 8th.  So, in some ways it did get
> better.

(*Id.*)

While troubling, these incidents—feeling "unsafe and intimidated," being the subject of a

"parody Twitter account," and being subjected to unspecified instances of "gender stigma and

some terms being used"—are neither specific nor severe enough to constitute actionable sexual

harassment under Sixth Circuit precedent.  *See Doe v. Univ. of Ky.*, 959 F.3d 246, 248, 251–52

(6th Cir. 2020) (plaintiff reported to her university that two fellow students had raped her, after

which one of these students subsequently "stared at her, stood by her at a party, followed her home,

and sat near her in the library," and the other student "stared at her during their shared classes";

the Court held that these allegations could not "show actionable sexual harassment" because the

conduct did not "suggest *sexual* harassment, let alone sexual harassment that is of a severe,

pervasive, and objectively offensive nature");[4] *Kollaritsch*, 944 F.3d at 624 (plaintiff encountered the student who had allegedly sexually assaulted her "at least nine times" after he had been disciplined, experiencing a panic attack on each occasion; the Court held that these encounters, absent further details to suggest the encounters "were sexual" or "severe, pervasive, or objectively unreasonable," did not constitute actionable further sexual harassment); *see also Pahssen*, 668 F.3d at 363 (three incidents of harassment—a shove into a locker, a "request for oral sex," and an obscene sexual gesture at a basketball game—did "not rise to the level of 'severe, pervasive, and objectively offensive' conduct"); *cf. Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000) (actionable sexual harassment where plaintiff was stabbed in the hand, held down by several students who attempted to disrobe her, and subjected to frequent verbal harassment). Although WKU undoubtedly could have handled these issues more effectively, Dahmer cannot demonstrate that she experienced actionable sexual harassment after WKU had "actual knowledge" of her alleged harassment, and therefore WKU is entitled to summary judgment on this claim.

### 2.      Faculty-on-Student Harassment

---

[4] Dahmer attempts to distinguish *Doe*, arguing that "*Doe* dealt with a Title IX claim of deliberate indifference and here, [Dahmer] has very clearly made a hostile environment claim." (D.N. 104-1, PageID # 6252)  But in fact, the claims are precisely the same—Dahmer seeks to hold WKU liable for its deliberate indifference to the alleged sexual harassment she experienced.  (*See* D.N. 38, PageID # 734–35)  Moreover, *Doe* applies the *Kollaritsch* framework, which Dahmer also cites (D.N. 104-1, PageID # 6249, 6252), and which the Court uses here.  Dahmer's attempt to distinguish *Doe* on its facts—that the assault in that case occurred off campus—also falls flat.  (*Id.*, PageID # 6252)  The *Doe* court reached its conclusion based on the severity and actionability of the post-assault harassment, not where the assault took place.  *Doe*, 959 F.3d at 251–52.  Finally, Dahmer's characterization of *Doe*'s holding—that "the [c]ourt found Doe needed to be sexually assaulted again . . . to have actionable harassment"(D.N. 104-1, PageID # 6252)—is incorrect.  *See id.* (holding that *Doe*'s subsequent interactions with her alleged rapists did not constitute actionable harassment).

"For a plaintiff to proceed on a claim against an educational institution under Title IX, a plaintiff must establish a prima facie case showing that: [a]) she was subjected to *quid pro quo* sexual harassment or a sexually hostile environment; b) she provided actual notice of the situation to an "appropriate person," who was, at a minimum, an official of the educational entity with authority to take corrective action and to end discrimination; and c) the institution's response to the harassment amounted to "deliberate indifference." *Klemencic v. Ohio State Univ.*, 263 F.3d 504, 510 (6th Cir. 2001) (citing *Morse v. Regents of the Univ. of Colo.,* 154 F.3d 1124, 1127–28 (10th Cir.1998)). To establish a prima facie case of hostile environment, Dahmer "must produce evidence that her educational experience was 'permeated with discriminatory intimidation, ridicule and insult that [was] sufficiently severe or pervasive to alter the conditions' of her education and create a sexually hostile environment." *Johnson v. Galen Health Inst., Inc.*, 267 F. Supp. 2d 679, 685 (W.D. Ky. 2003) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)). The offensive conduct "must be based on sex, rather than personal animus or other reasons." *Id.* (citing *Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 66 (1st Cir. 2002)).

The Court assesses the offensive conduct both objectively and subjectively, and the conduct "must be sufficiently severe or pervasive to create an environment that a reasonable person would find hostile." *Id.* (citing *Black v. Zaring,* 104 F.3d 822 (6th Cir.1997)). "In determining whether a plaintiff has established that an environment is hostile or abusive, a court must look specifically at (1) the conduct's severity; (2) the frequency of the abusive conduct; (3) whether it is physically threatening or humiliating rather than merely offensive; and (4) whether it unreasonably interferes with the plaintiff's performance." *Id*. (citing *Harris*, 510 U.S. at 23). "[S]poradic use of abusive language, gender related jokes, or occasional episodes of harassment"

do not create a hostile environment.  *Id.* at 685–86 (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)).

Dahmer argues that she "provided testimony to prove that the behavior she endured was severe, pervasive and objectively offensive relating to Pride."  (D.N. 105-1, PageID # 6911) Dahmer testified that Pride would invite her into his office "sometimes to say things that were lewd or inappropriate, things that, by any means, would be determined sexual harassment."  (D.N. 105-2, PageID # 7011)  But Dahmer identified only two specific instances of such conduct.[5]  First, Dahmer testified that Pride "referenced sexual activities between students" (*id.*, PageID # 7011), but Dahmer only described one specific example: Pride "had one time said that he felt like [Student 1] and [another student in SGA] like debated a lot during SGA . . . [to get] all riled up so that they could have more fun later.  And that was, I presume, in the sexual context."  (*Id.*, PageID # 7057) Dahmer also testified about a comment Pride made regarding keeping his office door open while meeting with her: "When I tried to keep the door open, he goes, oh, like, you're that kind of woman?  I guess I have to keep the door open."  (*Id.*, PageID # 7011)

---

[5] Dahmer's complaint also references a meeting where "Pride made derogatory comments to Andi and essentially berated her for 45 minutes."  (D.N. 38, PageID # 723)  But Dahmer testified that Pride did not make gender-based or sexist remarks toward her during this meeting.  (*See* D.N. 105-2, PageID # 7036)  Additionally, Dahmer's arguments about the experiences that other female students had with Pride do not support her hostile-environment claim.  (*See, e.g.*, D.N. 104-1, PageID # 6229)  It is correct that the Sixth Circuit has held that comments made to individuals other than the plaintiff can support a hostile-environment claim, *see Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998), and that "episodes of harassment concerning other woman are probative to [a] plaintiff's experience in a hostile work environment" if the plaintiff is aware of the episodes. *Wanchik v. Great Lakes Health Plan, Inc.*, 6 F. App'x 252, 262 (6th Cir. 2001).  But in *Abeita*, the plaintiff's supervisor frequently made "specific sexual and gendered statements" about other women in the presence of the plaintiff.  *See id.* at 248–52; *see also Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 273 (6th Cir. 2009) (noting that plaintiff was "unavoidably exposed" to her co-workers' "loud insulting language and degrading conversations").  Here, in contrast, Dahmer does not identify any instances where Pride made harassing comments about other female students in her presence, nor has she asserted that she was aware of any such comments at the time.

Pride, for his part, does not remember making the door comment, and states that he commented Student 1 and the other student "like to argue with each other" but that this was not about sex.  (D.N. 101-3, PageID # 5837)  But even assuming the veracity of Dahmer's account, she falls far short of establishing that Pride created a hostile environment.  First, assuming Pride's conduct was based on Dahmer's sex, the conduct itself—two inappropriate comments made by Pride—is significantly less severe than other instances where courts have found an environment sexually hostile.  *See Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 739, 750 (2d Cir. 2003) (plaintiff presented sufficient evidence of hostile environment where professor routinely referred to her as "Monica" [i.e., Lewinsky], and made comments that associated plaintiff "with some of the more sordid details of the Clinton/Lewinsky scandal"); *Mandsager v. Univ. of N.C. at Greensboro*, 269 F. Supp. 2d 662, 670, 675 (M.D.N.C. 2003) (plaintiff sufficiently pleaded sexually hostile environment based on allegations that professor frequently put his arm around her, called her "honey," and sexually propositioned her); *Massey v. Akron City Bd. of Educ.*, 82 F. Supp. 2d 735, 738–42, 745 (N.D. Ohio 2000) (hostile environment where teacher/counselor followed child into the bathroom, commented on students' physiques, called students at home, and engaged in a lengthy sexual relationship with at least one student).

Moreover, the conduct here is less severe than in cases where courts found that an environment was *not* sexually hostile.  *See Irrera v. Humpherys*, 695 F. App'x 626, 629–30 (2d Cir. 2017) (no hostile environment where professor "winked at [plaintiff], blew kisses at him, raised his eyebrows at him, and looked up and down at him in a sexual manner"); *Johnson*, 267 F. Supp. 2d at 686–87 (no hostile environment where professor on five occasions inappropriately touched plaintiff by sitting too closely to her, frequently referenced his own genitalia and referred

to body parts with perverse slang, and on one occasion touched the plaintiff's arms and shoulders and propositioned her).

Second, Dahmer identified only two specific comments that Pride made. *See Johnson*, 267 F. Supp. 2d at 686 (six occasions of inappropriate touching did not qualify as pervasive because plaintiff did not experience "severe harassment on a regular basis"). And while unquestionably unprofessional, both comments were "merely offensive" rather than "physically threatening or humiliating." *Id*. at 685 (citing *Harris*, 510 U.S. at 23). Finally, although Dahmer's GPA was lower during the 2017-2018 school year than it was in other semesters (*see* D.N. 105-2, PageID # 6987–88), she nevertheless graduated with a 3.85 GPA (*see id.*, PageID # 6987) and was the first-ever WKU student to receive the prestigious Truman Scholarship. (*See id.*, PageID # 6993) *See Johnson* at 687 (holding that professor's conduct did not sufficiently interfere with plaintiff's education when plaintiff did not stop going to class). In sum, although Dahmer undoubtedly viewed her environment as hostile, "a reasonable person in [Dahmer's] circumstances would [not] find the educational environment so severe, pervasive, and objectively offensive as to undermine [Dahmer's] educational experience and deny her equal access to [WKU's] resources and opportunities."[6] *Johnson*, 267 F. Supp. 2d at 685 (citing *Davis*, 526 U.S. at 650). WKU is therefore entitled to summary judgment on this claim.

### 3.    Retaliation

---

[6] In a later portion of her motion, Dahmer also argues that Pride intimidated her, "talked down to her," commented to another faculty member that Dahmer is "a sweet girl but not really Presidential," and told Dahmer, in regards to her possible impeachment, that "with your personality this will happen with you for the rest of your life." (D.N. 105-1, PageID # 6916) While no doubt offensive, these statements do not alter the Court's conclusion. Dahmer's assertions that Pride intimidated and talked down to her lack specificity, and Dahmer has not demonstrated that this conduct was "based on sex, rather than personal animus or other reasons." *Johnson*, 267 F. Supp. 2d at 685. The same holds true for the latter two comments, which are also "merely offensive." *Id.*

Dahmer argues that WKU retaliated against her for filing her Title IX lawsuit by denying her a letter of recommendation from President Caboni for her Rhodes Scholarship application. (*See* D.N. 105-1, PageID # 6911–12)  To establish a retaliation claim, "a Title IX plaintiff must show 'that (1) [s]he engaged in protected activity, (2) [the funding recipient] knew of the protected activity, (3) [s]he suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action.'"  *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020), *cert. denied sub nom. Bose, Prianka v. Bea, Roberto, et al.*, No. 20-216, 2021 WL 78095 (U.S. Jan. 11, 2021) (citing *Gordon*, 686 F. App'x at 320).  "To qualify as 'adverse,' an educational action must be sufficiently severe to dissuade a 'reasonable person' from engaging in the protected activity." *Gordon*, 686 F. App'x at 320 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  Examples of "sufficiently severe" adverse educational actions include suspension, in-class punishment, placement in a different class, and denying enrollment in a desired class. *Id.* at 320–21.

The parties agree, for purposes of their cross-motions for summary judgment, that Dahmer has satisfied the first two elements of her retaliation claim.  (*See* D.N. 66, PageID # 1004; D.N. 105-1, PageID # 6912)  As for the third, Dahmer argues that Caboni's decision not to endorse her scholarship application qualifies as an adverse action because Dahmer "did suffer damages as a result of this as she did not receive the Rhodes Scholarship."  (D.N. 105-1, PageID # 6912)  But it is undisputed that Dahmer received a strong letter of recommendation for the Rhodes scholarship from Lawrence Snyder, Jr., Dean of the Potter College of Arts & Letters.  (*See* D.N. 101-10)  Snyder's detailed letter, written "on behalf of [WKU's] endorsement committee," gave Dahmer "WKU's strongest endorsement," urged that Dahmer receive "your most serious consideration for the Rhodes Scholarship," and stated that "[t]he committee has no doubt that [Dahmer] will

accomplish amazing things." (*Id.* at PageID # 6124–25) Failing to receive a letter of recommendation signed by the President would not "dissuade a 'reasonable person' from engaging in" protected activity in this context, and thus does not qualify as adverse. *Gordon*, 686 F. App'x at 320 (citing *Burlington*, 548 U.S. at 68). Dahmer's retaliation claim therefore fails on the third element, and WKU is also entitled to summary judgment on this claim.[7]

## B.      Section 1983 Equal Protection Claims

Dahmer asserts that all the defendants violated 42 U.S.C. § 1983. (D.N. 38, PageID # 738–39) "A § 1983 claim must satisfy two elements: '1) the deprivation of a right secured by the Constitution or laws of the United States and 2) the deprivation was caused by a person acting under color of state law.'" *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir. 1995) (quoting *Simescu v. Emmet Cnty. Dept. of Social Servs.,* 942 F.2d 372, 374 (6th Cir.1991)). The parties agree that the defendants acted under color of state law. (D.N. 66, PageID # 1006; D.N. 105-1, PageID # 6914) Dahmer asserts that the alleged sexual harassment she experienced at WKU and the defendants' alleged deliberate indifference to it violated her "constitutional right to be free from sex discrimination under the Equal Protection Clause of the Fourteenth Amendment." (D.N. 38, PageID # 739)[8]

### 1.      Claim Against WKU

---

[7] WKU also argues that Caboni's decision not to write the letter was his own personal choice, rather than a decision made by WKU. (*See* D.N. 66, PageID # 1004 ("WKU cannot be held liable merely on account of Caboni's actions—[Dahmer] must demonstrate the institution itself retaliated against her.")) The Court need not address this argument because even assuming Caboni's action can be attributed to WKU, it does not qualify as adverse.

[8] Dahmer's complaint also asserts Defendants' alleged violations of Title IX as an underlying basis for her § 1983 claim (D.N. 38, PageID # 739), although she does not address this argument in her subsequent briefing. Regardless, since the Court found that the defendants did not violate Title IX, *see supra* part II(A), Dahmer's § 1983 claims based on Title IX necessarily fail.

WKU correctly argues that it is not subject to Dahmer's § 1983 claim.  (D.N. 66, PageID # 1007–08)  States and "governmental entities that are considered 'arms of the State'" are not "persons" under § 1983.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989); *see also Campbell v. Univ. of Louisville*, 862 F. Supp. 2d 578, 582 (W.D. Ky. 2012).  Since WKU is a public university, *see* Ky. Rev. Stat. § 164.290, it "qualifies as an arm of the state." *McCormick v. Miami Univ.*, 693 F.3d 654, 661 (6th Cir. 2012) (citing *Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 571 (6th Cir. 2000)).  WKU is therefore not subject to suit under § 1983.  *See Campbell*, 862 F. Supp. 2d at 582.  Moreover, WKU, "as an arm of the State, is immune from suit under the Eleventh Amendment."  *Univ. of Cincinnati*, 215 F.3d at 571; *see Campbell*, 862 F. Supp. 2d at 582; *see Averett v. Hardy*, No. 3:19-CV-116-DJH-RSE, 2020 WL 1033543, at *4 (W. D. Ky. Mar. 3, 2020).  WKU is therefore entitled to summary judgment on Dahmer's § 1983 claim against it.

### 2. Claims Against Individual Defendants

Anderson, Caboni, and Pride assert qualified immunity as a defense against Dahmer's § 1983 claims against them in their individual capacities.  (D.N. 66, PageID # 1008)  "Qualified immunity protects government officials performing discretionary functions unless their conduct violates a clearly established statutory or constitutional right of which a reasonable person in the official's position would have known." *Brown v. Lewis*, 779 F.3d 401, 411 (6th Cir. 2015) (quoting *Silberstein v. City of Dayton,* 440 F.3d 306, 311 (2006)).  A plaintiff seeking to overcome qualified immunity must satisfy a two-prong test.  *See id*. at 411–12.  "To satisfy the first prong at the summary-judgment stage, the plaintiff must show that 'based upon the applicable law, the facts viewed in the light most favorable to the plaintiff[] show that a constitutional violation has occurred.'"  *Id*. at 411 (quoting *Sample v. Bailey,* 409 F.3d 689, 695 (6th Cir. 2005)).  "For the second prong, she must also show that 'the violation involved a clearly established constitutional

right of which a reasonable person would have known.'" *Id.* (quoting *Sample,* 409 F.3d at 696). "The court may address these prongs in any order, and if the plaintiff cannot make both showings, the officer is entitled to qualified immunity." *Id*. at 412 (citing *Pearson v. Callahan,* 555 U.S. 223, 236 (2009)). Dahmer "bears the burden of demonstrating that the defendant[s] [are] not entitled to qualified immunity." *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 605 (6th Cir. 2006) (citing *Silberstein v. City of Dayton,* 440 F.3d 306, 311 (6th Cir. 2006)).

"[D]eliberate indifference to discriminatory peer harassment" can establish "an equal protection violation based on a school official's response to peer harassment." *Stiles*, 819 F.3d at 851–52 (internal citations omitted). Dahmer rests her deliberate-indifference claim on her Title IX claim. (*See* D.N. 105-1, PageID # 6915) "The deliberate indifference standard used for proving a § 1983 equal protection violation in peer harassment cases is 'substantially the same' as the deliberate indifference standard applied in Title IX cases." *Stiles*, 819 F.3d at 852 (citing *Williams ex rel.*, 400 F.3d at 369). Since Dahmer failed to show deliberate indifference in her Title IX claim because she did not establish actionable harassment after the time that WKU (and by extension, Anderson and Caboni) had actual knowledge of her alleged harassment, *see supra* part II(A), her deliberate-indifference § 1983 claim also fails. *See Stiles*, 819 F.3d at 834 ("[Plaintiff's] deliberate indifference equal protection claim fails for the same reason as his Title IX claim"). Since Dahmer has not shown that a constitutional violation occurred, Anderson and Caboni are "entitled to qualified immunity." *Brown*, 779 F.3d at 412 (citing *Pearson*, 555 U.S. at 236).

The analysis differs as to Pride, since Dahmer claims that he had actual knowledge of her harassment in the fall of 2017, when he allegedly "witnessed and directly participated in the harassing behavior." (D.N. 105-1, PageID # 6904) Dahmer argues that "Pride was plainly incompetent and violated the law in . . . failing to intervene when [Dahmer] and her female peers

were experiencing sexual harassment in SGA."  (D.N. 104-1, PageID # 6261)  Assuming Pride's inaction violated a constitutional right, Dahmer has not shown that this right was clearly established.  "Only when 'existing precedent' places the rule at issue 'beyond debate' will we consider the law 'clearly established.'"  *Kesterson*, 967 F.3d at 524 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  "Unless a reasonable official, confronted with the same facts, would know that the challenged actions violate the law, qualified immunity bars liability."  *Id.* (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018)).  Dahmer has not identified any precedent showing that a reasonable faculty member in Pride's shoes would know that failing to intervene in the behavior of the SGA members would give rise to an equal-protection claim. Dahmer points to two cases—*Patterson v. Hudson Area Schools* and *Shively v. Green Local School District Board of Education*—as clearly establishing "that Pride could be held liable for acting with deliberate indifferent [sic] to [Dahmer's] claim of harassment."  (D.N. 104-1, PageID # 6262 (citing *Patterson*, 551 F.3d 438, 439 (6th Cir. 2009), *abrogated by Foster v. Bd. of Regents of Univ. of Mich.*, 982 F.3d 960 (6th Cir. 2020); *Shively*, 579 F. App'x 348, 350 (6th Cir. 2014))  But *Patterson*—which dealt with a school board's response to gender discrimination—and *Shively*— which dealt with a school district's Title IX liability—do not "bear on the question at hand." *Kesterson*, 967 F.3d at 526 (holding that *Patterson* and *Shively* did not clearly establish law that "would warn a reasonable coach" about a deliberate-indifference equal-protection claim where the coach—a mandatory reporter—had failed to report the plaintiff's rape allegation).  Dahmer has thus failed to show that any alleged violation by Pride "involved a clearly established constitutional right of which a reasonable person would have known," and Pride is therefore entitled to qualified immunity.  *Brown*, 779 F.3d at 411–12.

Finally, Dahmer also argues that Pride's alleged sexual harassment of her violated her equal-protection rights.  (D.N. 105-1, PageID # 6915–16)  But the evidence does not show that a constitutional violation occurred.  Sexual harassment violates the Equal Protection Clause when it is "sufficiently severe or pervasive to interfere unreasonably with [the victim's] educational activities."  *Johnson v. Murray State Univ.*, No. 5:13-CV-156-R, 2014 WL 906129, at *5 (W.D. Ky. Mar. 7, 2014) (citing *Jennings v. Univ. of N.C.,* 482 F.3d 686, 701 (4th Cir. 2007)).  Dahmer's § 1983 claim rests on the same conduct as her Title IX faculty-on-student sexual-harassment claim. (*See* D.N. 105-1, PageID # 6916)  As previously discussed, Pride's conduct was not sufficiently severe to undermine Dahmer's educational experience.  *See supra* part II(A).  For those same reasons, Dahmer has failed to show that Pride's conduct "was sufficiently severe or pervasive to interfere unreasonably with [her] educational activities."  *Murray State*, 2014 WL 906129 at *5 (citing *Jennings*, 482 F.3d at 701).

Since Dahmer has failed to show that a constitutional violation occurred, Pride is entitled to qualified immunity.  *Brown*, 779 F.3d at 412 (citing *Pearson*, 555 U.S. at 236).

## C.   Supplemental Jurisdiction

Dahmer's remaining negligence claims all arise under Kentucky law and were before this Court pursuant to the Court's supplemental jurisdiction authorized by 28 U.S.C § 1367(a).  (*See* D.N. 38, PageID # 720)  Having disposed of Dahmer's federal claims—the only basis for subject-matter jurisdiction—the Court declines to exercise supplemental jurisdiction over Dahmer's remaining state-law claims.  Pursuant to 28 U.S.C. § 1367(c)(3), this Court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . [it] has dismissed all claims over which it has original jurisdiction."  In the Sixth Circuit, there is "a strong presumption against the exercise of supplemental jurisdiction once federal claims have been dismissed"; the Court should retain

jurisdiction "only in cases where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh [the] concern over needlessly deciding state law issues." *Packard v. Farmers Ins. Co. of Columbus*, 423 F. App'x 580, 584 (6th Cir. 2011) (quoting *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006)).

The discretion to decline supplemental jurisdiction over state-law claims extends to all stages of litigation, including summary judgment. *See Booker v. City of Beachwood*, 451 F. App'x 521, 523 (6th Cir. 2011) (citing *Nails v. Riggs*, 195 F. App'x 303, 313 (6th Cir. 2006)). The fact that the parties have engaged in extensive discovery does not bar this Court from declining to adjudicate state-law claims. *See Jeung v. McKrow*, 264 F. Supp. 2d 557 (E.D. Mich. 2003); *Practice Perfect, Inc. v. Hamilton Cty. Pharm. Ass'n*, 732 F. Supp. 798 (S.D. Ohio 1989). When declining to exercise supplemental jurisdiction, the Court may either dismiss the state-law claims or remand them. *Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754, 761 (6th Cir. 2000). "In exercising that discretion, the Court may consider the convenience of the parties and expeditiousness in resolving the case." *Jeung*, 264 F. Supp. 2d at 572 (citing *Long*, 201 F.3d at 761).

Here, the Court concludes that remanding Dahmer's state-law claims to state court is the appropriate disposition. Because the parties have conducted extensive discovery in this matter, dismissing the claims would not serve the interest of judicial economy.

## III.

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)    Defendants' motion for summary judgment (D.N. 66) is **GRANTED**.

(2)    Dahmer's motion for partial summary judgment (D.N. 105-1) is **DENIED**.

A separate judgment will be entered this date.

(3)    Dahmer's remaining state-law claims are **REMANDED** to state court pursuant to 28 U.S.C. § 1367(c)(3).

(4)    Defendants' motion to exclude expert testimony (D.N. 71) is **DENIED** as moot.

(5)    Dahmer's motion to exclude expert testimony (D.N. 75) is **DENIED** as moot.

March 2, 2021

**David J. Hale, Judge**
**United States District Court**